UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PATRICK DENNIS McHUGH,

        Plaintiff,

   -vs-


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

        Defendant.

_____

**DECISION AND ORDER**
**No. 11-CV-00578(MAT)**

## INTRODUCTION

Represented by counsel, Patrick Dennis McHugh ("Plaintiff" or "McHugh"), brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

On August 27, 2009, Plaintiff filed applications for DIB and SSI, claiming disability as of December 19, 2008, based on conditions afflicting his neck, back, and right shoulder. T.133, 143-149, 169.[1] Plaintiff's applications for benefits were denied

---

[1] Citations to "T.__" refer to pages from the administrative transcript.

on February 24, 2010.   T.67-74. Plaintiff was represented by counsel at the administrative hearing on May 18, 2010. On October 1, 2010, Administrative Law Judge Timothy McGuan ("the ALJ") denied Plaintiff's application for benefits. T.13-31. The Appeals Council denied Plaintiff's request for review on May 24, 2011, making the ALJ's decision the final decision of the Commissioner. T.1-6.

This action followed. Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

### I.   Relevant Medical Evidence

#### A.   Evidence Before the Onset Date

On April 25, 2007, Plaintiff was involved in a motor vehicle accident ("MVA") and sustained injuries to his neck and right upper extremity.   On June 12, 2007, Plaintiff underwent an MRI of the cervical spine, which revealed disc herniations at C6-C7, C5-C6, C4-C5, and C3-C4. An MRI of Plaintiff's right shoulder revealed tenodesis with no identifiable tears, moderate osteoarthritis of the acromioclavicular joint with slight encroaching of the supraspinatus outlet, and degenerative changes of the superior labrum.   See T.281-83, 479.

On September 27, 2007, Plaintiff was referred by his primary care physician, Thomas F. Hughes, M.D., to Lee R. Guterman, M.D. ,

who found that Plaintiff had "severe limited range of motion of his cervical spine on flexion, extension, lateral bending, and rotation[.]" Dr. Guterman noted that Plaintiff "ha[d] a weak grip, approximately 4/5, biceps 4/5, triceps 4+/5." Id. He also noted loss of sensation in Plaintiff's right upper extremity, although Plaintiff's reflexes appeared to be normal. Dr. Guterman diagnosed Plaintiff with cervicalgia and joint pain in the shoulder region. See T.489-90.

Following a referral from Dr. Guterman, P. Jeffrey Lewis, M.D., evaluated Plaintiff on November 2, 2007. Plaintiff had a herniated disc at C6-C7 with right C7 radiculopathy and muscle atrophy of the right triceps muscle. Dr. Lewis also noted that Plaintiff had right cubital tunnel syndrome from the ulnar nerve compressing the elbow on the right. Both conditions were caused by Plaintiff's 2007 MVA. See T.317-19.

On November 15, 2007, Plaintiff met with Eugene Gosy, M.D. and Deborah Dzielski, ANP. Plaintiff's neck extension was 10% of normal, and his flexion and right rotation were 50% of normal. Plaintiff's trapezius was tender, there were no trigger points on the spine, and straight-leg raises ("SLRs") were negative. Plaintiff's strength in both his upper and lower extremities was 5/5, his joint pressing maneuvers were normal, his sensation was intact to pinprick, and his cranial nerves were intact. See T.213-15.

On November 21, 2007, Plaintiff had x-rays taken of his cervical spine, which revealed spondylosis at C5-C6 and C6-C7, and mild dextroscoliosis, possibly due to spasm. T.380. On November 30, 2007, Dr. Lewis performed disc replacement surgery on Plaintiff. T.340-42. Post-surgery, Plaintiff underwent physical therapy and pain management treatment with Dr. Gosy. T.216-20, 221-27.

Due to continued pain, Plaintiff began pain management treatment with Gerald L. Peer, M.D. in early August 2008. T.284-86. Dr. Peer assessed that lateral flexion of Plaintiff's right shoulder bilaterally was 50% of normal, his abduction was 90% of normal, his upper extremity strength was 5/5 bilaterally, and his range of motion in his left shoulder was full. T.289. Plaintiff could walk heel to toe, and had right-sided hypoesthesia at C6-C7. Id. Plaintiff's reflexes were symmetrical bilaterally. Dr. Peer's diagnosis was intervertebral disc displacement without myelopathy, for which he prescribed a transcutaneous electrical nerve stimulation ("TENS") unit. Dr. Peer noted that Plaintiff was working part-time on a light duty basis, and his disability was "moderate, partial and temporary." T.289. Plaintiff continued to treat with Dr. Peer on a monthly basis until May 7, 2009. T.353.

On September 17, 2008, Plaintiff was involved in another MVA, which resulted in increased neck pain and injury to his right shoulder. T.327. On November 17, 2008, Plaintiff underwent a

magnetic resonance arthrogram of his right shoulder, which revealed a full thickness tear of his posterior supraspinatus tendon. T.241. On December 17, 2008, orthopedist Joseph E. Buran, M.D. performed arthroscopic surgery on Plaintiff's right shoulder to repair the torn rotator cuff. T.238-39. Post-surgery, Dr. Buran noted that Plaintiff was doing "generally" well, his pain had diminished, and he was neurologically intact. Dr. Buran determined that Plaintiff was disabled and referred him to a physical therapist. T.304, 307.

**B. Medical Evidence After the Onset Date**

Due to his chronic pain, Plaintiff returned to see Dr. Peer on February 11, 2009, at which time Dr. Peer determined that Plaintiff was temporarily totally disabled due to his right shoulder surgery. T.270.

On March 25, 2009, Plaintiff underwent a computed tomography ("CT") scan of his cervical spine, which showed no abnormalities at C2-C3, C3-C4 and T1-T2. T.243.

In April 2009, Dr. Lewis noted that Plaintiff was recovering well from his recent shoulder, and that he appeared to have symptoms associated with ulnar nerve compression syndrome at the elbow. T.329. An MRI of Plaintiff's cervical spine revealed subtle degenerative changes at C5-C6 with the possibility of scoliosis. T.337. Dr. Lewis opined that Plaintiff could return to work on a part-time basis. T.322.

On June 19, 2009, Plaintiff returned to Dr. Buran's office. Vincent E. Lorenz conducted an assessment and determined that Plaintiff was doing well but had some residual loss of range of motion in his shoulder. He also noted that Plaintiff had "excellent strength" and had "good function and can return to work in reference to his shoulder." T.312. Lorenz assessed that Plaintiff "is disabled at this time, not because of the shoulder, but because of the neck." T.312.

On June 23, 2009, Plaintiff underwent an EMG nerve study which revealed mild chronic left C8 radiculopathy and bilateral nerve compression. T.331, 338-39.

On July 8, 2009, Dr. Guterman examined Plaintiff and found slight weakness in his right grip and biceps, diminished range of motion in his neck, and diminished pinprick sensation in the left C7-C8 distribution. T.507. Dr. Guterman assessed that Plaintiff had a "reasonable" range of motion in the cervical spine except for right rotation, which was limited. Flexion and extension were good. Dr. Guterman concluded that Plaintiff could not return to doing scaffold work. T.507.

On November 24, 2009, Plaintiff underwent surgery on his left elbow to address his cubital tunnel syndrome. T.428. Post-surgery, Plaintiff reported to Dr. Lewis that he felt much better and that he was able to feel his fingers. T.429.

X-rays and an MRI of Plaintiff's cervical spine were taken on February 26, 2010. The x-rays revealed dextroscoliosis; early degenerative discogenic changes at C5-C6; and status post-prosthetic disc insertion at C6-C7, with no evidence of loosening or migration. T.138. The MRI revealed a mild disc bulge at C4-C5, and an annular tear and small central disc herniation at C3-C4. T.136-37.

At a follow-up visit on March 5, 2010, Dr. Lewis reported that Plaintiff had some residual symptoms from the November 2009 surgery but was improving. T.134. Plaintiff had residual neck pain and the MRI showed an artifact at C6-7 and C5-C6 (the prosthetic disc replacement), with some degeneration and bulging at C3-C4 and C4-5, which possibly was the site of Plaintiff's pain. T.134. Dr. Lewis did not believe that further surgery was required, and he advised Plaintiff to continue taking Loratab and begin pain management therapy. T.134.

Kathleen Kelley, M.D. performed a consultative examination of Plaintiff on December 9, 2009. Dr. Kelley diagnosed Plaintiff with status post-cervical spine surgery with radiculopathy, status post-right shoulder surgery with decreased range of motion, left ulnar decompression, seizure disorder since childhood, and headaches with associated migraines. Dr. Kelley opined that when Plaintiff engaged in repetitive bending or twisting of the cervical spine, he required comfort breaks. She also opined that Plaintiff needed to

refrain from repetitive activity using his right arm, especially with overhead reaching. See T.431-35.

Neurologist Michael J. Battaglia, M.D. had treated Plaintiff for his epilepsy for about 20 years. He noted, in a March 28, 2010 report, that he had last seen Plaintiff in May 2006. T.487-88. Dr. Battaglia stated that Plaintiff suffered from complex partial seizures, as well as nocturnal seizures. Dr. Battaglia opined that Plaintiff's seizures were clustering, and noted that Plaintiff would suffer from a severe headache the day after a seizure. Plaintiff reported to Dr. Battaglia on March 26, 2010, that his seizures had increased from 2 to 15 times a night, each lasting a couple of minutes. T.487. Dr. Battaglia recommended that Plaintiff undergo blood tests and advised him to avoid drinking any alcohol. Dr. Battaglia noted that it was unsafe for Plaintiff to drive a motor vehicle because of his "poorly controlled" epilepsy, and that Plaintiff should not swim, climb ladders or work at heights. T.488.

## II. Other Relevant Evidence

### A. Plaintiff's Testimony

Plaintiff testified that he was 41-years-old and had an Associate's Degree. His past relevant work was as a foreman and scaffold rigger in a family business involved in stained glass renovations of historic buildings. Plaintiff testified that he has suffered from epilepsy since he was 9 or 10 years-old. T.36-40.

In April 2007, Plaintiff was involved in an MVA, in which he sustained multiple herniated discs in his cervical spine. Following the accident, he tried physical therapy and massage therapy, epidural and trigger point injections, use of a TENS unit and pain management, but none of these modalities provided long-term relief. T.42-44. Plaintiff testified that, after this accident, he attempted to go back to work. Because it was a family business at which he had worked for approximately 20 years, they accommodated his disability. He could not do anything physical and was only able to give others instructions. He testified that he worked approximately 20 hours per week. T.55-56.

In September 2008, Plaintiff was involved in another MVA, in which he sustained injuries to his right shoulder and left elbow. Plaintiff did not return to work after this accident. Subsequently, he underwent surgery on his right rotator cuff and his left elbow. T.39-46.

Plaintiff testified that he treated with Drs. Capicotta, Guterman, and Lewis for his neck injury, and that Dr. Lewis performed surgery on his neck in 2007. Plaintiff testified that he also treated with Drs. Gosy, Peer and Wagmire for pain management. He saw Dr. Guterman for trigger point injections every three to five months. T.41-43.

After his neck surgery, Plaintiff experienced pain at the level of a 4 or 5 out of 10. He testified further that, since his

surgery, he has fewer muscle spasms and his right arm symptoms have been alleviated. He still experienced shoulder pain, but not as extensively as before his shoulder surgery. Plaintiff testified that he can lift his right arm to shoulder height, frontwards and sideways but is limited in extending his arm backwards. T.48-53.

Plaintiff stated that he takes medication for his migraine headaches, epilepsy, and pain. T.58. Plaintiff's migraine headaches and epilepsy are discussed further, infra.

**B.  The Vocational Expert's Testimony**

Vocational Expert Jay Steinbrenner ("the VE") testified that Plaintiff's window manufacturing job was skilled and medium in exertional demands. Plaintiff's part-time light-duty job after his neck injury was skilled and sedentary. T.60-61.

The ALJ presented the VE with a hypothetical individual of the same age as Plaintiff, with the same education and vocational background, and who was limited to sedentary work, but who could not perform overhead reaching with his dominant (right) arm; climb ropes, ladders and/or scaffolds; and who needed to avoid all concentrated exposure to height and hazards. The VE testified that this individual could not perform Plaintiff's past job, but could perform certain unskilled sedentary jobs, such as telephone marketer and telephone surveyor. The VE testified further that if this individual needed to lie down during regular breaks, but not

at will, this individual could still perform these jobs.  T.61-64.

**DISCUSSION**

## I.  General Legal Principles

Title 42 U.S.C., Section 405(g) directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  The Court's scope of review is limited to whether the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. E.g., Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (citations omitted).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." Klofta v. Mathews, 418 F. Supp. 1139, 1411 (E.D. Wis. 1976) (quoted in Costanzo v. Apfel, No. 98-CV-606H, 2000 WL 575660, at *2 (W.D.N.Y. Feb. 8, 2000)). The Commissioner's determination will not be upheld if it is based on an erroneous view of the law that fails to consider highly probative evidence. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). In such cases, the reviewing

court has the authority to reverse with or without remand. See
42 U.S.C. §§ 405(g), 1383(c)(3).

## II.  The ALJ's Decision

The ALJ followed the required five-step analysis, see
20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v), for
evaluating disability claims. T.15-25.  Under step one, the ALJ
found that Plaintiff had not engaged in substantial gainful
activity since December 19, 2008.  T.15.  At step two, the ALJ
concluded that Plaintiff has the following severe impairments:
cervical disk without myelopathy and status post-surgery; brachial
neuritis or radiculitis; status post-surgery of the shoulder; and
status post-surgery of the elbow. T.15-16. At step three, the ALJ
determined that none of these severe impairments, considered singly
or in combination, met or medically equaled a listed impairment.
Id. At steps four and five, the ALJ concluded that Plaintiff had
the residual functional capacity ("RFC") to perform sedentary work,
subject to certain limitations. T.16-24.  Relying on the VE's
testimony, the ALJ found that Plaintiff was unable to perform any
past relevant work, but that considering Plaintiff's age,
education, work experience, and RFC, Plaintiff could perform
certain jobs that exist in significant numbers in the national
economy.

## III. Analysis of Plaintiff's Arguments

### A.  The ALJ's Finding Regarding Listing 1.04(A)

Plaintiff argues that the ALJ erred in concluding that Plaintiff's impairments do not meet or equal the listed impairment for spinal disorders as set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). See Plaintiff's Memorandum of Law ("Pl's Mem.") at 10. Defendant does not specifically address this argument but contends that the record as a whole supports the ALJ's finding of no disability.

At step three, the burden of establishing that a condition meets or equals one of the listed impairments rests with the claimant. Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). A claimant may definitively establish disability at step three by proving that his impairment meets all of the requirements of a particular listing. 20 C.F.R. §§ 404.1520(d), 416.920(d). Alternatively, disability may be shown when a claimant's condition, although it does not meet the specific criteria of a listing, is functionally equivalent to a listed condition. Id. For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. § 416.926(a)) (emphasis in original). "A claimant cannot qualify for benefits

under the 'equivalence' step by showing that the overall functional impact of his (or her) unlisted impairment or combination of impairments is as severe as that of a listed impairment." <u>Zebley</u>, 493 U.S. at 531 (citation omitted).

Listing 1.04(A) provides, in relevant part, as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus [herniated disc], spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve route (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) or accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Thus, a disability under Listing 1.04(A) requires an image of a herniated nucleus pulposus (herniated disc), evidence of neuro-anatomic distribution of pain, limited motion, motor loss, sensory loss, and positive straight-leg-raising tests. <u>See</u> <u>id.</u>

Under the regulations, the ALJ's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, as shown in the medical evidence, with the medical criteria as shown with the listed impairment. <u>See</u>, <u>e.g.</u>, 20 C.F.R. §§ 404.1526(a); 416.926(a). When an adverse finding is made at step

three, the ALJ must justify this determination with more than a brief, conclusory statement that the claimant's conditions do not "meet[ ] or equal[] one of [the] listings in appendix 1 to subpart P of part 404." 20 C.F.R. § 416.920(a)(4)(iii). E.g., Rivera v. Astrue, No. 10 CV 4324(RJD), 2012 WL 3614323, at *11 (E.D.N.Y. Aug. 21, 2012) (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982)). Rather, the ALJ must "set forth a specific rationale in support of the . . . conclusion." Berry, 675 F.2d at 468; see also Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991) (The ALJ's decision must contain "a sufficient explanation of his reasoning to permit the reviewing court to judge the adequacy of his conclusions."). Here, the ALJ found, without analysis or explanation, that "the medical evidence of record does not establish that the claimant has an impairment[] that meets, equals, or *even remotely approaches* the level of severity required by [Listing] 1.04." T.23 (emphasis supplied).

Failure to set forth a "specific rationale" does not dictate remand in all cases, such as where the ALJ's disability determination can be "reasonably inferred" based on "substantial evidence" contained elsewhere in the opinion. Berry, 675 F.2d at 468-69. The Second Circuit has cautioned, however, that there would be cases in which a court "would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the

ALJ." Berry, 675 F.2d at 469. In such cases, the Second Circuit "would not hesitate to remand the case for further findings or a clearer explanation for the decision." Id. (internal citations omitted). This is such a case.

First, the ALJ failed to support his step-three conclusions with a "specific rationale[,]" Berry, 675 F.2d at 468, merely stating that he had considered Listing 1.04(A) and Plaintiff did not come "remotely close" to meeting it. However, as Plaintiff notes, although he had a disc replaced at C6-C7, he still has "three or four [disc] herniations and two annular tears" as well as "objective findings which cover the requirements set forth in 1.04(A)[,]" including pain and diminished range of motion in his neck and sensory loss. Pl's Mem. at 10 (citing T.213-20, 370). Plaintiff points to an EMG conducted after his neck surgery which showed chronic left C-8 radiculopathy and bilateral medial nerve compression. Id. (citing T.331, 338-339). In addition, Plaintiff states, he has loss of reflexes and muscle weakness indicative of motor loss. Id. (citing T.317, 366).

Second, unlike in Berry, the balance of the evidence in the record does not permit this Court to discern the ALJ's rationale, especially considering the "credibility determinations and inference drawing" required of the ALJ in this case, Berry, 675 F.2d at 469. The ALJ's opinion contains a lengthy—though selective—recitation of Plaintiff's medical history. At no point,

however, did the ALJ attempt to link any given piece of evidence to the criteria set forth in Listing 1.04(A).

In addition, as described <u>infra</u>, the ALJ erroneously disregarded substantial and uncontradicted evidence of Plaintiff's seizure disorder and erred in making his credibility determination. "The balance of the record thus does not cure the ALJ's failure to include a 'specific rationale' for his step-three conclusion[.]" <u>Rivera v. Astrue</u>, No. 10 CV 4324(RJD), 2012 WL 3614323, at *12 (E.D.N.Y. Aug. 21, 2012). The Court is unable to determine whether the ALJ's step three conclusion is supported by "substantial evidence", and remand is therefore warranted.

On remand, the ALJ should explain his reasons for finding that Plaintiff does not meet or equal Listing 1.04(A) and should do so with sufficient specificity to allow a court to meaningfully review such justification.

## B. Failure to Consider Epilepsy and Headaches as "Severe Impairments"

Plaintiff's second argument is principally focused on the ALJ's failure to address, at step two, whether his epilepsy and migraine headaches were severe impairments. <u>Id.</u> at 12. Plaintiff asserts that "[his] multiple impairments, when taken in combination, render him unable to do the full range of sedentary work." Pl's Mem. at 11.

The Commissioner is required to "consider the combined effect of all of [the claimant's] impairments without regard to whether

any such impairment, if considered separately, would be of sufficient severity" to establish eligibility for Social Security benefits. 20 C.F.R. §§ 404.1523; 416.923. If the Commissioner "do[es] find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." Id.; see also 20 C.F.R. § 416.945(a)(2). At step two, impairments are considered "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c). The Second Circuit has strongly cautioned that the severity standard at step two is to be applied "solely to screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (citation omitted).

The ALJ found that "there are [sic] no objective evidence [Plaintiff] has a seizure disorder." T.23. This statement is erroneous and is plainly contradicted by the medical record. For instance, in the diagnosis section of her report, consultative examiner Dr. Kelley referenced a "seizure disorder" based on Plaintiff's history of epileptic seizures since childhood. T.435. Neurologist Dr. Battaglia diagnosed Plaintiff with epilepsy, which is clearly recognized as "a type of seizure disorder."[2] In 2006,

---

[2]   http://www.epilepsyfoundation.org/aboutepilepsy/(last accessed July 30, 2013). The Merck Manuals Online Medical Library states that "[a] seizure disorder (epilepsy) is diagnosed when a patient has ≥ 2 seizures not related to reversible stressors." http://eglobalmed.com/core/MerckMultimedia/www.merck.com/mmpe/pri

Plaintiff reported to Dr. Battaglia that he was experiencing cluster seizures 2 to 6 times per night, followed by severe headaches the next day. T.487. In 2010, Plaintiff was suffering from "complex partial seizures" as well as "nocturnal seizures". He reported having 2 to 15 seizures per night, and rarely having seizures during the day. T.487. Dr. Battaglia noted that Plaintiff's seizure disorder was unusual in terms of its frequency and characteristics. T.488.

Not only did the ALJ err in concluding that Plaintiff did not suffer from a seizure disorder, he erred in ignoring Plaintiff's history of migraine headaches in formulating his list of Plaintiff's "severe" impairments. As consultative examiner Dr. Kelley observed, Plaintiff suffers from "headaches and associated migraines" which are intertwined with his epilepsy/seizure disorder. T.435. Plaintiff testified that he has chronic headaches approximately 20 to 30 times per month, and that these headaches transform into migraines 2 to 15 times per month. T.47. Plaintiff's "bad" headaches, which cause photosensitivity, occur approximately 10 times per month. T.48. Plaintiff's epileptic seizures, which occur in clusters ranging from 30 seconds to 5 minutes in duration, sometimes combine with a severe headache.

nt/sec16/ch214/ch214a.html (last accessed July 30, 2013). See also Franklin v. Consolidated Edison Co. of N.Y., Inc., No. 98 Civ. 2286(WHP), 1999 WL 796170, at *11 (S.D.N.Y. Sept. 30, 1999) ("Plaintiff has idiopathic seizure disorder, commonly known as epilepsy.").

The resultant symptoms can last for several days. T.53-54. The seizures that last approximately 5 minutes cause debilitating after-effects, and the post-seizure symptoms can last for a 5- to 8-day period. According to Plaintiff, the seizures are sometimes so severe that he does not leave the house. T.54. Plaintiff believes his inability to sleep through the night due to chronic pain increases his stress level which increases the frequency of his seizures. T.53. Plaintiff testified that his previous employer made accommodations for him when he suffered from epileptic seizures and related symptoms by, e.g., allowing him to go home from work early.

Where, as here, an ALJ misreads a critical piece of evidence in the record, and then relies on his error in reaching his opinion, the decision cannot be said to be supported by "substantial evidence." See, e.g., Maldonado v. Apfel, 98 Civ. 9037(AKH), 2000 WL 23208, at *1 (S.D.N.Y. Jan. 13, 2000) (decision of ALJ denying disability benefits could not stand where ALJ had misread a doctor's report, and it was thus "plain" that the opinion had not properly accounted for that report). The ALJ also improperly "picked and chose" evidence in the record that supported his conclusion that Plaintiff's migraine headaches and epilepsy were not "severe" impairments. See, e.g., Fiorello v. Heckler, 725 F.2d at 175-76; Andino v. Bowen, 665 F. Supp. 186, 190 (S.D.N.Y.1987).

Courts in this Circuit have generally remanded for a renewed severity determination when an ALJ has made an error at step two. E.g., Spears v. Heckler, 625 F. Supp. 208, 212–13 (S.D.N.Y. 1985); see also Taylor v. Astrue, No. 6:11–cv–588(GLS), 2012 WL 1415410, at *2 (N.D.N.Y. Apr. 24, 2012) (cited in Pierce v. Astrue, ___ F. Supp.2d ___, 2013 WL 2179295, at *13 (W.D.N.Y. May 17, 2013)). Here, as discussed above, the ALJ erred at step two in finding that Plaintiff's epilepsy was not a seizure disorder and in ignoring Plaintiff's migraine headaches. The present record strongly suggests that Plaintiff's seizure disorder and migraine headaches are "severe impairments" for purposes of step two which, as the Second Circuit has emphasized, is not a demanding standard.

On remand, prior to conducting a renewed severity determination the ALJ shall re-contact Plaintiff's neurologist, Dr. Battaglia, and request a functional assessment report. Dr. Battaglia's report should also include an evaluation of the side effects, if any, caused by Plaintiff's various medications. This information should prove useful in re-assessing Plaintiff's RFC.

### C.   The ALJ's Credibility Assessment

Plaintiff argues that the ALJ failed to properly evaluate his credibility.  In particular, Plaintiff claims, the ALJ ignored the objective medical evidence substantiating his subjective complaints of pain (e.g., EMG evidence of radiculopathy and bilateral medial nerve compression) and failed to consider the limiting effects of

Plaintiff's seizure disorder and migraine headaches. The Court has already determined sufficient bases exist for ordering the matter remanded. However, the Court will briefly address Plaintiff's contentions so that further errors can be avoided on remand.

The ALJ here found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the symptoms' intensity, persistence and limiting effects were only "partially consistent with the record." T.23. In particular, the ALJ noted that the record did not support Plaintiff's claim of frequency of of seizures because treatment notes from his primary care physician, Dr. Hughes, from November 2008, to November 2009, "indicated he denied any seizures and headaches." Id. (citing Exhibit 18F). Again, the ALJ has misrepresented the medical records. Exhibit 18F, T.354-425, covers treatment notes from Dr. Hughes from April 2007, to November 2009. Throughout this time-period, in every treatment note except for three, Dr. Hughes indicated diagnoses of petit mal seizures and headache (by specifically indicating ICD-9-CM code 784.0). T.361-64, 383-84, 387-405, 421-22. On September 22, 2008, Plaintiff denied recent seizures, but he still was on Depakote, an anticonvulsant used in the treatment of epilepsy and severe headaches. T.413-14. At an appointments November 24, 2008, and December 16, 2008, which were around the time of his second MVA and shoulder surgery, there is no specific diagnosis of epilepsy or headaches. However, he was on

Depakote which, as noted, is a medication used to treat epilepsy and headaches. T.416, 418. Thus, Plaintiff was still suffering from a seizure disorder which apparently was relatively well controlled on medication at that time.

"Because the ALJ's adverse credibility finding, which was crucial to his rejection of [the claimant's] claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand." Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010); see also Horan v. Astrue, 350 F. App'x 483, 485 (2d Cir. 2009) (finding that where ALJ's credibility analysis was based on a number of factual errors involving plaintiff's purported testimony and alleged inconsistencies with other evidence, it was not supported by substantial evidence). The ALJ again selectively parsed the record to find evidence to support his adverse credibility finding, and misconstrued the record in his analysis. Accordingly, the Court cannot say that his credibility determination is supported by "substantial evidence" and for this additional reason, remand is warranted. E.g., Rivera v. Astrue, 2012 WL 3614323, at *9 (citing Genier, 606 F.3d at 48–49 (remanding where ALJ's credibility determination was based on the statement that plaintiff admitted that he was able to perform certain household tasks when, in fact, he testified that he tried to do those tasks, but required assistance because of severe fatigue)).

**CONCLUSION**

For the foregoing reasons, this Court finds that the Commissioner's denial of DIB and SSI was erroneous as a matter of law and not based on substantial evidence. Plaintiff's motion (Dkt. No. 9) for judgment on the pleadings is granted to the extent that the Commissioner's decision is reversed and the matter is remanded for further administrative proceedings consistent with this Decision and Order. The Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 13) is denied.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     August 6, 2013
           Rochester, New York